**TEXAS DEPARTMENT OF PUBLIC SAFETY, Appellant,**

v.

**Hugo RODRIGUEZ and Maria Rodriguez, Appellee.**

No. 01–10–00602–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 19, 2011.

Nichelle A. Cobb, Assistant Attorney General, Austin, TX, for Appellant.

Cynthia D. Rendon, Rendonpeterson Law Firm, Houston, TX, Paul A. Higdon, Stern Miller & Higdon, Bellaire, TX, for Appellee.

Panel consists of Justices JENNINGS, HIGLEY, and BROWN.

## OPINION

HARVEY BROWN, Justice.

This interlocutory appeal arises from a personal injury lawsuit brought by Hugo

Rodriguez and Maria Rodriguez as a result of an automobile collision with a vehicle driven by an officer of the Texas Department of Public Safety. The trial court denied DPS's plea to the jurisdiction, which was based on the defense of official immunity for its officer, Sergeant Parker. On appeal, DPS contends that Sergeant Parker did not have to satisfy the heightened need/risk assessment elaborated in *Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex.1997), for determining whether a public official acts in good faith for purposes of the official immunity defense for police pursuit cases. Under *Wadewitz*, the good faith determination utilizes a two-part test that balances the seriousness of the situation, as well as the alternatives available to the official, against the risks created by the conduct. *Scott v. Britton*, 16 S.W.3d 173, 179 (Tex.App.-Houston [1st Dist.] 2000, no pet.). DPS argues that this Court should instead utilize the more general good faith test described in *Telthorster v. Tennell*, 92 S.W.3d 457, 462 (Tex. 2002). DPS asserts that this general test, which does not require a specific assessment of need/risk of the officer's decision-making, applies in a lawsuit arising from a vehicular accident resulting from moving surveillance of potential criminal activity.

For reasons explained below, we conclude that the need/risk analysis of *Wadewitz* applies. We hold that DPS did not conclusively establish Sergeant Parker's good faith under that test. We therefore affirm.

## Factual Background

DPS Sergeant Parker was part of a team of police officers conducting ongoing surveillance of a person suspected of criminal drug activity. The drug investigation began after the suspect made several deposits of more than $10,000 into a local financial institution, generating a suspicious activity report from the IRS. Both Sergeant Parker and his supervising officer, Lieutenant Webb, stated the purpose of the surveillance was "documenting the activities of a subject under investigation."

Sergeant Parker was part of a 7 to 10 member team of officers participating in the moving surveillance. Lieutenant Webb was traveling behind the suspect's vehicle, and Sergeant Parker followed Lieutenant Webb in an unmarked van. Shortly before noon, Sergeant Parker was traveling south in the middle lane of Kirby Drive approaching Old Spanish Trail in Houston, Texas. Both Kirby and Old Spanish Trail are divided two-way streets with multiple lanes of traffic in both directions. Each street had a speed limit of 40 miles per hour. This is an intersection with a high volume of traffic.

As Sergeant Parker reached the intersection, he saw the suspect's vehicle proceed through a yellow light. The light changed to red before he reached the intersection. Lieutenant Webb successfully ran the red light but Parker stopped his vehicle. After checking approaching traffic in all lanes, he concluded that it was safe to drive through the intersection. According to his deposition and affidavit, Sergeant Parker cautiously moved into the intersection across Old Spanish Trail. One vehicle, however, was stopped in the middle lane of the eastbound traffic on Old Spanish Trail, obstructing his view of traffic in the outside lane of Old Spanish Trail.

Hugo Rodriguez was unfortunately traveling eastbound in that outside lane and therefore was not seen by Parker as he attempted to pass through the intersection. Rodriguez collided with Sergeant Parker in the intersection. According to Sergeant Parker's affidavit, the collision occurred "at a very low speed." Hugo and his wife Maria were injured. Both vehi-

cles were driven from the scene by their respective drivers.

The Fleet Safety Board investigated the accident. The board determined that the collision was preventable, that Sergeant Parker's disregard of the red light was the major contributing factor to the collision, and that Sergeant Parker failed to do everything reasonable to prevent the collision.

## Procedural Background

The Rodriguezes sued DPS, but did not sue Sergeant Parker individually. The Rodriguezes claimed, among other acts of negligence, that Sergeant Parker disregarded the traffic light, failed to maneuver his vehicle so as to avoid the collision, and engaged in faulty evasive action. The Rodriguezes also included a claim for gross negligence.

In a single pleading, DPS filed a plea to the jurisdiction, motion for summary judgment and motion to dismiss. DPS asserted the affirmative defenses of sovereign and official immunity. The plea was supported by the affidavits of Sergeant Parker and Lieutenant Webb. Neither of these affidavits provided details about why Parker, as a member of the surveillance team, needed to continue through the intersection on a red light. Parker did not testify that the suspect had been speeding or driving recklessly so that it would be difficult or dangerous to catch up to Lieutenant Webb.

In response, the Rodriguezes filed portions of the deposition of Sergeant Parker and the letter from the Fleet Safety Board concluding that the accident was preventable. They did not offer any affidavit from an expert.

The trial court denied the plea to the jurisdiction, motion for summary judgment, and motion to dismiss. DPS timely appealed. We have jurisdiction over this interlocutory appeal pursuant to sections 51.014(a)(5) and (8) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(5), (8) (West 2008); *City of Houston v. Kilburn*, 849 S.W.2d 810, 812 (Tex.1993).

## Standard of Review

We review a trial court's ruling on a plea to the jurisdiction de novo. *Tex. Dept. of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004); *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex.2002). When reviewing a trial court's ruling on a plea, "we first look to the pleadings to determine if jurisdiction is proper, construing them liberally in favor of the plaintiffs and looking to the pleader's intent." *City of Waco v. Kirwan*, 298 S.W.3d 618, 621–22 (Tex. 2009).

A defendant's plea may challenge either the plaintiffs' pleadings or the existence of jurisdictional facts. *See Miranda*, 133 S.W.3d at 226–27. When, as here, the defendant challenges the existence of jurisdictional facts, "we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." *Id.* at 227; *see also Tex. Natural Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex.2001). If that evidence raises a fact issue as to jurisdiction, the defendant's plea must be denied. *Miranda*, 133 S.W.3d at 227–28. If, however, the relevant evidence is undisputed or does not present a jurisdictional fact issue, the plea should be granted. *Id.* at 228.

The standard of review for a plea to the jurisdiction "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id.* Therefore, the governmental unit asserting an official immunity affirmative defense must meet the summary judgment standard of proof

as a movant. *Ross v. Linebarger, Goggan, Blair & Sampson, L.L.P.*, 333 S.W.3d 736, 744 (Tex.App.-Houston [1st Dist.] 2010, no pet.). Once it meets its burden of proof, the plaintiff must show that a disputed material fact exists. *Id.* In considering the evidence, we "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Miranda*, 133 S.W.3d at 228. "In deciding a plea to the jurisdiction, a court may not consider the merits of the case, but only the plaintiff's pleadings and the evidence pertinent to the jurisdictional inquiry." *Ross*, 333 S.W.3d at 744 (citing *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex.2002)).

### Claims against DPS

Under the doctrine of sovereign immunity, DPS is not liable for the torts of its officers unless there is a waiver of immunity. *Mount Pleasant Indep. Sch. Dist. v. Estate of Lindburg*, 766 S.W.2d 208, 211 (Tex.1989). Section 101.021 of the Texas Tort Claims Act grants a limited waiver of sovereign immunity for personal injuries proximately caused by "the negligence of an employee acting within the scope of his employment" if the injuries "arise[ ] from the operation or use of a motor-driven vehicle." TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(1)(A) (West 2011).

■ Waiver of immunity under this section of the Texas Tort Claims Act also requires proof that "the employee would be personally liable to the claimant according to Texas law...." TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(1)(B) (West 2011). Conversely, if the employee is protected from liability because of official immunity, then the governmental entity is shielded from liability due to its sovereign immunity. *Univ. of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex.2000); *DeWitt v. Harris Cnty.*, 904 S.W.2d 650, 653 (Tex. 1995); *Kilburn*, 849 S.W.2d at 812. In other words, if Sergeant Parker is immune from tort liability under the official immunity doctrine, DPS is also immune. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(1)(B); *see Clark*, 38 S.W.3d at 580.

### Official Immunity

■ Government officials are entitled to official immunity[1] for (1) the performance of their discretionary duties (2) conducted within the scope of their authority (3) provided they act in good faith. *Telthorster*, 92 S.W.3d at 461; *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). The Rodriguezes do not contest that Sergeant Parker acted within the scope of his authority or that his actions were discretionary. Thus, it is the third element, good faith, that is in dispute here. Only when the defendant conclusively establishes each of the three elements of qualified immunity does a plaintiff have to rebut the qualified immunity with proof of bad faith. *See Telthorster*, 92 S.W.3d at 461; *Kassen v. Hatley*, 887 S.W.2d 4, 8–9 (Tex.1994). If the government official does not prove each element of official

---

1. Official immunity is also sometimes referred to as qualified immunity. *City of Houston v. Daniels*, 66 S.W.3d 420, 424 (Tex.App.-Houston [14th Dist.] 2001, no pet.); *City of Hempstead v. Kmiec*, 902 S.W.2d 118, 120 n. 1 (Tex.App.-Houston [1st Dist.] 1995, no writ); *see Travis v. City of Mesquite*, 830 S.W.2d 94, 100 n. 2 (Tex.1992) (Cornyn, J., concurring); *see also Brand v. Savage*, 920 S.W.2d 672, 674 (Tex.App.-Houston [1st Dist.] 1995, no writ). As we noted in *Kmiec*, "the term 'official immunity' is confusing because official immunity covers acts performed by a government official in the person's individual capacity, not in the person's official capacity." 902 S.W.2d at 120 n. 1. The phrase "qualified immunity" underscores that the immunity is not absolute.

immunity, the burden never shifts to the plaintiff to come forward with controverting evidence. *City of Pasadena v. Belle,* 297 S.W.3d 525, 531 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *see also Telthorster,* 92 S.W.3d at 465.

We must first determine the proper test for evaluating whether Sergeant Parker acted in good faith. The Rodriguezes assert that the heightened need/risk analysis of *Wadewitz* should apply. DPS asserts that this Court should utilize the more general good faith test described in *Telthorster.* As discussed below, we must address this issue because if *Wadewitz* applies, DPS has a higher burden of proof to establish Sergeant Parker's good faith.

## A. Introduction

■■■ Because it is difficult to determine the contours of the good faith inquiry that is part of the official immunity defense, we begin with a discussion of the policies behind official immunity and its historical development. *See Chambers,* 883 S.W.2d at 656. Official immunity is an affirmative defense that an official must plead and prove. *Clark,* 38 S.W.3d at 580; *Wadewitz,* 951 S.W.2d at 465. The official immunity doctrine protects public officers from civil liability for conduct that would otherwise be actionable. *Chambers,* 883 S.W.2d. at 654. The Texas Supreme Court has noted that the official immunity doctrine requires "a fair balance between the competing interests at stake." *Chambers,* 883 S.W.2d at 656; *see also Telthorster,* 92 S.W.3d at 461; *Clark,* 38 S.W.3d at 580–81. The court in *Chambers* identified the competing interests as "(1) there is the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of

his position, to exercise discretion; and (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good." *Chambers,* 883 S.W.2d at 656. The purpose of official immunity was further explained by the Texas Supreme Court in *Kassen v. Hatley:*

> The purpose of official immunity is to insulate the functioning of government from the harassment of litigation, not to protect erring officials. The public would suffer if government officers, who must exercise judgment and discretion in their jobs, were subject to civil lawsuits that second-guessed their decisions. Official immunity increases the efficiency of employees because they need not spend time defending frivolous charges.

887 S.W.2d at 8 (citations omitted); *see also Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424 (Tex.2004) (stating that official immunity's purpose is to ensure public officials "act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation"); *Travis v. City of Mesquite,* 830 S.W.2d 94, 102 n. 4 (Tex. 1992) (observing that official immunity serves the following important public policies: avoiding inhibition of discretionary action, minimizing deterrence of qualified people from government service, avoiding costs of unnecessary trial, and insulating officials from burdensome discovery).

## B. Good faith: an objective test

■■■ Good faith for official immunity is not measured by the official's subjective intent.[2] *Chambers,* following the lead of

---

**2.** Indeed, if a defendant only produces evidence of his or her subjective good faith, summary judgment is inappropriate. *See Tex.*

*Dep't of Public Safety v. Tanner,* 928 S.W.2d 731, 736 (Tex.App.-San Antonio 1996, no writ). The subjective feelings of the public

federal courts, rejected a subjective standard because it would make summary judgments difficult to obtain and would largely eviscerate the important public policy reasons for qualified immunity. The court instead adopted a test of "objective legal reasonableness." *Chambers*, 883 S.W.2d at 656 (quoting *Swint v. City of Wadley*, 5 F.3d 1435, 1441–42 (11th Cir. 1993)). By adopting an objective test, the court defined good faith "in a counterintuitive fashion" but also made it easier for a public official to obtain summary judgment. *See Belle*, 297 S.W.3d at 530.

■ The Court preferred an objective standard because it "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Chambers*, 883 S.W.2d at 656 (quoting *Swint*, 5 F.3d at 1441–42). This accommodation for reasonable error exists because "officials should not err always on the side of caution" out of a fear of being sued. *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (citations omitted). Official immunity protects public officials from personal liability for "mistaken judgment." *Ballantyne*, 144 S.W.3d at 423. Official immunity is based on the recognition "that the risk of some error is preferable to intimidation from action at all." *Id.* at 424.

■ The objective good faith element of the official immunity defense requires the defendant official to prove that a reasonable official under the same or similar circumstances could have believed the defendant's conduct was justified. *Chambers*, 883 S.W.2d at 656–57. The test is "analogous to the abuse of discretion standard of review." *Clark*, 38 S.W.3d at 581. Applying that general test to a high-speed pursuit, the court stated that in such a case, the officer acts in good faith if "a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *Chambers*, 883 S.W.2d at 656. The test does not require the officer to prove what a reasonably prudent officer should or should not have done. *Id.*; *Belle*, 297 S.W.3d at 531.[3] *Chambers*, therefore, gives public officials the "benefit of the doubt" in close cases because if officers of reasonable competence could disagree, immunity applies. 883 S.W.2d at 656–57; *Chapa v. Aguilar*, 962 S.W.2d 111, 114 (Tex.App.-Houston [1st Dist.] 1997, no writ).

■ In response to evidence of objective good faith, the nonmovant must meet "an elevated standard of proof" to defeat the official immunity defense. *Chambers*, 883 S.W.2d at 656. It is insufficient for the nonmovant to show merely that other alternative courses of action would have also been reasonable or preferable. *Ballantyne*, 144 S.W.3d at 426 (stating that the test "is not what was the best course of action"). It is likewise insufficient for the nonmovant to show merely that the individual defendant "did not act as a reasonably prudent official," because proof of negligence does not satisfy the objective

official, whether they demonstrate subjective good faith or bad faith, are not relevant to qualified immunity. *Ballantyne*, 144 S.W.3d at 427–28; *Thomas v. Collins*, 960 S.W.2d 106, 111 (Tex.App.-Houston [1st Dist.] 1997, pet. denied); *Rhodes*, 901 S.W.2d at 798; *Tanner*, 928 S.W.2d at 736.

**3.** *See also Clark*, 38 S.W.3d at 581 (nonmovant's response is insufficient if it demonstrates merely that a reasonable officer could have decided not to take the same action); *Chapa v. Aguilar*, 962 S.W.2d 111, 114 (Tex.App.-Houston [1st Dist.] 1997, no writ) (proof of the actions that an official *could have taken* rather than what a reasonable officer *could have believed* is insufficient).

good faith required by *Chambers. Beatty v. Charles*, 936 S.W.2d 28, 31 n. 2 (Tex. App.-San Antonio 1996, no writ).[4] Instead, the nonmovant must show that "no reasonable official *could have thought* that the facts were such that they justified the official's conduct." *Chambers*, 883 S.W.2d at 657; *Kassen*, 887 S.W.2d at 9. Stated differently, the nonmovant must show that a public official in the same position "could not have reasonably reached the decision in question." *Chambers*, 883 S.W.2d at 657 n. 7.

Additionally, the official's actions are reviewed based on the facts known at the time rather than subsequent evidence. In other words, the focus is on whether a reasonable official in light of the information possessed by the defendants at the time they acted could have believed the actions were justified. *Ballantyne*, 144 S.W.3d at 426; *Wadewitz*, 951 S.W.2d at 467; *Chambers*, 883 S.W.2d at 656; *Rhodes v. Torres*, 901 S.W.2d 794, 800 (Tex.App.-Houston [14th Dist.] 1995, no writ).

### C. The specificity required for balancing need vs. risk in an emergency pursuit

In *Wadewitz*, the Court adhered to *Chambers'* general good-faith framework

but also "elaborated on the need and risk elements and applied them" to an emergency response by a police officer traveling to the scene of a reported burglary. *Telthorster*, 92 S.W.3d at 461 (discussing *Wadewitz* ).

 *Wadewitz* explained that the need aspect of the balancing test refers to the urgency of the circumstances requiring police intervention and requires an evaluation of the following factors: (1) the seriousness of the crime or accident to which the officer is responding, (2) whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and (3) what alternative courses of action, if any, are available to achieve a comparable result. *Id.* The risk aspect refers to the countervailing public safety concerns and requires an evaluation of the following factors: (1) the nature and severity of the harm the officer's actions could cause, (2) the likelihood that any harm would occur, and (3) whether the risk of harm would be clear to a reasonably prudent officer. *Wadewitz*, 951 S.W.2d at 467.[5] In addition, the facts of the case may require the expert to provide a continuing assessment of the "need" and "risk" factors because emergency respons-

---

**4.** Although it has some concepts that overlap with negligence principles (the objective good faith of the official is reviewed under a standard that includes two elements similar to a general negligence test—the "reasonable person" and "the same or similar circumstances"), the good-faith standard is not the equivalent of a general negligence test, which addresses what a reasonable person would have done. *Wadewitz*, 951 S.W.2d at 467. "The standard of good faith as an element of official immunity is not a test of carelessness or negligence, or a measure of an official's motivation." *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex.2004). To allow official immunity to be overcome by proof of mere negligence would defeat the purposes of official immunity for public offi-

cials who exercise broad discretion in their tasks. *See Belle*, 297 S.W.3d at 531; *see also Chambers*, 883 S.W.2d at 655 ("The complex policy judgment reflected by the doctrine of official immunity, if it is to mean anything, protects officers from suit even if they acted negligently.").

**5.** After *Wadewitz* and before *Telthorster*, the Supreme Court rejected a governmental entity's argument that the *Wadewitz* factors only apply to an emergency response and do not apply to a police pursuit case. *Clark*, 38 S.W.3d at 582. The court held that the general considerations leading to the adoption of the need/risk analysis set forth in *Wadewitz* applied equally to a police pursuit case.

es and police pursuits may involve rapidly changing circumstances. *Id.*

### D. Official immunity in an arrest

DPS contends that a need/risk balancing test does not need to be satisfied in lawsuits against police officers that do not arise from a high-speed pursuit but from moving surveillance. Rather, DPS argues that we should follow *Telthorster*, in which the Texas Supreme Court held that such an analysis was unnecessary in a claim arising out of an arrest. 92 S.W.3d at 462. As an initial matter, DPS points out that the Court in *Telthorster* emphasized that the *Chambers* "could have believed" test balanced the need to apprehend a suspect against the risk of harm applied "*in a pursuit case,*" and therefore has no application to this case. *See Telthorster,* 92 S.W.3d at 461 (emphasis in original).

The Court in *Telthorster,* however, did not base its decision on the label used to describe the police conduct in the case; rather, it analyzed the rationale underlying the balancing test including whether the requirement of a detailed need/risk analysis would effectuate the policy concerns implicated in an arrest. *Id.* at 462. The Court noted a particular need to provide immunity to protect police officers. *Id.* at 463.

> "Nowhere else in public service is official immunity more appropriate or necessary than in police work. In their routine work, police officers must be free to make split-second judgments . . . based on their experience and training,

without fear of personal liability." If police officers were subject to liability for every mistake, the constant threat of suit could "dampen the ardor of all but the most resolute, or the most irresponsible" officers.

*Id.* (citations omitted).[6] The official immunity doctrine is shaped in part by the public policy concern of avoiding "overdeterrence of energetic law enforcement." *Id.* (quoting *Rowland v. Perry,* 41 F.3d 167, 172 (4th Cir.1994)).

With respect to high-speed driving, other specific policy concerns are implicated. The first reason for adopting a risk/need analysis in high speed pursuits is to improve protection of bystanders or other innocent persons who might be injured. Second, requiring an officer "to particularly and meaningfully balance" the need for and risk created by high speed pursuits ensures that the officer's consideration was more than "merely pro forma." *Id.* at 464.

Finally, the Court compared the policy concerns impacted by a high-speed pursuit with those in an arrest. The "inherent risk to the general public" created during an arrest are "not as substantial" as police action causing injuries during a high-speed chase. *Id.* During arrest situations, officers routinely are forced to make split-second judgments in circumstances that are "tense, uncertain, and rapidly evolving." *Id.* at 463. The risk of liability might cause arresting officers to act hesitantly when immediate action is required, subjecting themselves and the

---

**6.** One reason that police officers have broad discretion is that they often make decisions "in an atmosphere of confusion, ambiguity and swiftly moving events." *Scheuer v. Rhodes,* 416 U.S. 232, 242, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974). Police officers have a "broad range of duties and authority" and "must often act swiftly and firmly." *Id.* at 246, 94 S.Ct. 1683. Moreover,

"police officers .... routinely make close decisions in the exercise of the broad authority that necessarily is delegated to them" and "are subject to a plethora of rules 'often so voluminous, and ambiguous, and contradictory, and in such flux that officials can only comply with or enforce them selectively.'" *Davis v. Scherer,* 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (U.S.1984).

public to unnecessary risks. *Id.* at 464. Thus, when an officer is engaged in an arrest that results in injury to the suspect, a particularized need/risk assessment is not necessary. *Id.*

Instead, the arresting officer must satisfy the general requirements of *Chambers* without the specific need/risk analysis. The officer must demonstrate "that a reasonably prudent officer, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred." *Id.* at 465.

■ If the arresting officer satisfies this burden, the nonmovant must likewise follow the general standards set forth in *Chambers.* The nonmovant in its response must offer evidence that *no* reasonable officer in the same or a similar situation "could have believed that the facts were such that they justified his conduct." *Id.* at 460. " '[I]f officers of reasonable competence could disagree on this issue,' the officer acted in good faith as a matter of law." *Id.* at 465 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).[7]

### Conclusion on the Standard for Good Faith

■ We conclude, after examining the policies underlying immunity generally and the specific policy concerns implicated in claims arising from pursuit cases that involve violation of traffic laws, that *Wadewitz's* requirement for a specific need/risk assessment applies in this case.

■ First, the general policies underlying immunity are not undercut by applying *Wadewitz* here. The focus of official immunity "must remain upon the facts of the individual case and the underlying policies promoted by official immunity." *Kassen,* 887 S.W.2d at 12. The *Wadewitz* standard does not impose a heavy burden on an officer and maintains the balance of the interests implicated by the good faith standard for official immunity. Requiring an officer to satisfy the need/risk analysis when the officer violates traffic laws while pursuing a suspect during moving surveillance does not overly deter "energetic law enforcement," *Telthorster,* 92 S.W.3d at 463 (quoting *Rowland,* 41 F.3d at 172), or make officers overly cautious in deciding whether to disregard a red light. In determining whether no reasonable officer could have believed it was safe to violate a particular traffic law under particular circumstances present at the time in question based on the knowledge possessed at that time, the officer necessarily must consider both the need to violate that law and the benefits of taking that action. The *Wadewitz* standard will still protect officers from lawsuits arising from moving surveillance by giving them the benefit of the doubt in close cases, excusing officer's conduct that is not "legally correct" but is "colorable," and providing immunity for mere negligence. *See Ballantyne,* 144 S.W.3d at 426; *Chambers,* 883 S.W.2d at 657. Under that standard, when a public official considers two courses of action that could reasonably be believed to be justified, and selects one, he satisfies the good faith "prong of official immunity as a matter of law." *Ballantyne,* 144 S.W.3d at 426. And the limitation that the could-have-believed test focuses on the officer's knowledge at the time in question underscores the policy objective that the officer's decision should not be "second-guessed." *Kassen,* 887 S.W.2d at 8.

---

**7.** Since *Telthorster,* the Texas Supreme Court has utilized this general standard in claims against city council and zoning board mem-

bers. *Joe,* 145 S.W.3d at 164; *Ballantyne,* 144 S.W.3d at 426.

Second, utilizing the *Wadewitz* standard also aids courts by ensuring that officers attempting to establish official immunity do not submit conclusory affidavits to satisfy their burden of proof but instead address the specific needs and risks implicated by a traffic law violation. *Wadewitz,* 951 S.W.2d at 466; *Medina Cnty. Comm'rs Court v. Integrity Grp., Inc.,* 944 S.W.2d 6, 10 (Tex.App.-San Antonio 1996, no writ); *cf. Chapa,* 962 S.W.2d at 115 (recognizing that trial courts "struggle routinely with the adequacy of affidavits in governmental immunity cases"). The officer must address the particular circumstances present in order to avoid submitting conclusory proof. *Wadewitz,* 951 S.W.2d at 466. *Wadewitz* simply identifies the factors that an officer "particularly and meaningfully balance" in assessing the need for police intervention in a given case, factors that are inherent in the *Chambers* balancing test. *See Telthorster,* 92 S.W.3d at 464; *Clark,* 38 S.W.3d at 582. In the end, the requirement that the officer address the need and benefit of his course of action when he violates a traffic law during moving surveillance requires merely the elaboration of the facts underlying what an officer could have believed was justified under the circumstances. Given the public safety concerns discussed below, it is not too much to ask officers to provide such proof.

Third, the public safety concerns implicated in accidents arising from police pursuit and emergency responses are applicable to accidents arising from moving surveillance. Official immunity balances the benefit to society of protecting police officers against the need to provide compensation for government imposed injuries. The risk to the general public is the same here, in *Chambers,* in *Wadewitz,* and in Clark. *See Clark,* 38 S.W.3d at 583 (pursuing a suspect and responding to an emergency involve the same general risk to the public—"a collision with a third party"). As in *Chambers* and *Clark,* this case involves an officer's violation of traffic laws while operating a vehicle in "pursuit" of a suspect.

The safety concerns implicated in an arrest are far different than those in moving surveillance. The Court, in deciding that the *Wadewitz* need/risk analysis did not apply to the arrest in *Telthorster,* contrasted the significant differences in the risks inherent in the two activities. In *Chambers,* the risk was "[t]he inherent risk to the general public that high-speed driving causes." *Telthorster,* 92 S.W.3d at 464. In *Telthorster,* there was no "evidence that the circumstances surrounding [the suspect's] arrest created a risk to bystanders or the public in general." *Id.* In this case, the decision to violate traffic laws by running a red light, like the decision to violate a speed limit or other traffic laws during a pursuit or emergency response, puts bystanders and the general public at risk.

Finally, the general policies underlying immunity and unflinching law enforcement are particularly applicable in arrests. In an arrest situation,

> [a]rresting officers often confront at close range suspects whose violent intentions and capabilities may not be readily apparent. A high risk of liability in such a situation would likely compel arresting officers to act hesitantly when immediate action is required, subjecting themselves and the public to unnecessary "risks, and seriously hamper[ing] their efforts to apprehend dangerous criminal suspects."

*Id.* (quoting *United States v. Merritt,* 695 F.2d 1263, 1274 (10th Cir.1982)). The Court in *Telthorster* also noted that official immunity's underlying purpose, "in the context of street-level police work" pro-

tects officers in situations that "frequently require[ ] quick and decisive action in the face of volatile and changing circumstances." *Id.* In contrast, in this case, the officers were following—not confronting—a suspect. There is no evidence in this case that the situation was "volatile" or involved the immediate potential danger of violence present in the arrest in *Telthorster.*

Because the policy concerns in this case are more similar to *Wadewitz* than to *Telthorster,* we conclude that the need/risk assessment of the good faith inquiry in *Wadewitz* and *Clark* should apply. Thus, to establish good faith, DPS must conclusively prove that a reasonably prudent officer in the same or similar circumstances could have believed the need to run the red light to continue the surveillance outweighed the risk of harm to the public, taking into consideration all the *Wadewitz* factors. *Clark,* 38 S.W.3d at 583. That proof should address each of the need and risk factors identified in *Wadewitz. See* 951 S.W.2d at 464.

### Application of that Standard to the Facts in this Case

We must now decide whether DPS's evidence established that a reasonable police officer under the same or similar circumstances as Sergeant Parker could have believed the decision to proceed through the red light was justified. DPS offered two affidavits to satisfy its burden of proof on what a reasonable officer could have believed. Although it is unnecessary to "use the exact language *Wadewitz* employs," the movant's summary judgment evidence must "establish facts upon which the court could have based its legal conclusion." *Clark,* 38 S.W.3d at 585–86; *see also Telthorster,* 92 S.W.3d at 465 ("[g]ood faith is not mechanical inquiry, but rather turns on the particular facts presented").

### A. Sergeant Parker's affidavit

Sergeant Parker's affidavit states in pertinent part:

I exercised my discretion and determined that the need to protect the physical safety of the other investigating officers; the need to maintain contact with the known suspect and the need to protect the public at large from a suspected criminal activity, outweighed the minimal risk to the public that would be created by continuing with the investigation and possibly being involved in an accident while traveling to the suspected crime in progress, therefore, I proceeded to follow the subject of our criminal investigation. Based upon all of my experience and training in law enforcement, I can state that I acted in "good faith" as a reasonable and prudent peace officer in making my decision to continue my investigation. Further, based upon all of my experience and training in law enforcement, I can, and do, state that another reasonably prudent peace officer, under the same or similar circumstances, could have believed that the need to continue the moving surveillance of the suspect, outweighed the minimal risk of harm to the public, of a potential traffic accident, that would be created by the peace officer traveling to the location of the reported crime in progress. Based upon my experience and training as a peace officer, I can, and do, state that I acted in "good faith" as a reasonably prudent peace officer in the manner in which I drove my vehicle on Kirby Drive in Houston, Texas. Further, based upon my training and experience as a peace officer, I can, and do, state that another reasonably prudent peace officer, under the same or similar circumstances, could have operated his vehicle in the same manner as I did; and, could have determined that the

need to continue the ongoing surveillance created a minimal risk of harm to others at the intersection of Kirby Drive and Old Spanish Trail.

### B. Lieutenant Webb's affidavit

In his affidavit, Lieutenant Webb states in pertinent part:

I believe that Sergeant Parker acted as a reasonably prudent Sergeant under circumstances he observed at the time. Sergeant Parker was fully justified in concluding to continue his surveillance of the target's vehicle and justified in slowly and cautiously entering the intersection of Kirby Drive and Old Spanish Tr[ai]l to do so. Furthermore, in my judgment and experience, I believe that a reasonably prudent peace officer could have considered that surveillance and maintaining visual contact with the suspect necessary to protect other officers, the public at large and to continue his efforts at gathering relevant information for future apprehension. I believe Sergeant Parker acted as a reasonably prudent officer would have acted given those circumstances.

Lieutenant Webb also states there were a "limited number of DPS vehicles able to maintain visual contact with the surveillance target."

### C. Conclusion

 The affidavits, to the extent that they contain assertions that Sergeant Parker had a "need" to run the red light to continue surveillance, do not explain the need in terms similar to the needs identified in *Wadewitz*. The need factors include: (1) the seriousness of the crime or accident to which the officer is responding, (2) whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and (3)

what alternative courses of action, if any, are available to achieve a comparable result. The "seriousness of the crime or accident to which the officer responds" was not discussed; in fact, there was only a suspected crime and no evidence of an emergency or an intent to arrest or detain the suspect. Both Parker's and Webb's affidavits confirm that they were following the suspect for the purpose of "documenting the [suspect's] activities." Although both officers assert that Sergeant Parker's presence was necessary and allude to danger to other officers or the public, no facts are detailed to support that conclusion that Parker's "immediate presence [was] necessary to prevent injury or loss of life or to apprehend a suspect." *See Wadewitz*, 951 S.W.2d at 467 (conclusory affidavit is not sufficient to support summary judgment). Neither officer suggests that the suspect was armed or had a violent history or that the suspect was driving recklessly. Neither officer addresses whether other alternatives were available to Parker to remain part of the surveillance team, such as staying in contact with Lieutenant Webb by radio to determine the suspect's location and catching up on other streets. *See Belle*, 297 S.W.3d at 533 (citing *Clark*, 38 S.W.3d at 583) (noting affidavit that failed to address alternative course of action as required by *Wadewitz* is insufficient).

While Sergeant Parker averred in his affidavit that there were "a limited number of vehicles able to maintain visible contact with the surveillance target vehicle," he testified in his deposition that "7 to 10" vehicles were involved in the surveillance. Sergeant Parker did not offer evidence about the number of DPS vehicles that passed safely through the intersection ahead of him or the location of the other vehicles.[8] His affidavit suggests that there was no plan to confront or arrest the

---

8. The fact that Sergeant Parker was the sec-

ond vehicle behind the suspect, following

suspect. Sergeant Parker did not suggest that the suspect knew of the surveillance or might try to take evasive action if Parker was delayed at the red light. He also did not address the need to maintain continuous surveillance on that particular date or explain the consequences of losing visual surveillance if Lieutenant Webb were also to lose contact with the suspect.

Neither officer specifically addresses the risk factors identified in *Wadewitz*. The risk factors include: (1) the nature and severity of the harm the officer's actions could cause, (2) the likelihood that any harm would occur, and (3) whether the risk of harm would be clear to a reasonably prudent officer. *Wadewitz*, 951 S.W.2d at 466. Sergeant Parker describes the risk as "minimal" but does not explain the basis for this conclusion except that he stopped and looked. There is no evidence from the two affidavits regarding the amount of the traffic, the weather, road conditions, or visual obstructions.[9]

Finally, the required standard of review requires us to view the evidence in favor of the Rodriguezes and draw all reasonable inferences in their favor. There is no statement by Sergeant Parker or Lieutenant Webb, or any other evidence, to establish that the "physical safety" of the other officers was at risk. There is no evidence that Sergeant Parker, one vehicle out of a team of "7 to 10" officers, was necessary to maintain contact with the suspect that they were investigating or the location of the other officers. Indeed, the evidence establishes that Lieutenant Webb made it through the red light, and a reasonable inference from that evidence is that he was able to maintain contact with the suspect. There is no evidence that there was a "reported crime in progress." Nor is there any evidence that the surveillance could not be conducted without Sergeant Parker. The evidence before us shows that Lieutenant Webb made it through the red light but, after the accident with the Rodriguezes, returned to the scene. A reasonable inference in favor of the Rodriguezes is that other officers were available to continue the surveillance or that the need to continue the surveillance was not so great that Lieutenant Webb could not stop it to return to the scene of what DPS describes as a "low speed" accident. These facts and the reasonable inferences from these facts do not conclusively establish that a reasonable police officer under the same or similar circumstances as Sergeant Parker could have believed the decision to proceed through the red light was justified.

Because the affidavits do not address all the *Wadewitz* factors and do not state the facts upon which the conclusions are based, we hold that the DPS did not establish Sergeant Parker's objective good faith[10] as a matter of law under the *Wadewitz* standard.

We overrule the DPS's sole issue.

## Conclusion

We affirm the trial court's order denying DPS's plea to the jurisdiction, motion for summary judgment and motion to dismiss.

Lieutenant Webb, is disclosed in the deposition excerpt offered by the Rodriguezes. Neither party presented evidence concerning the location of any of the rest of the "7 to 10" officers involved in the surveillance.

**9.** The evidence on the high traffic volume was submitted by the Rodriguezes.

**10.** Sergeant Parker's conclusion that "I can, and do, state that I acted in 'good faith,'" to the extent it expresses his subjective state of mind, is irrelevant to the objective good faith inquiry. *Ballantyne*, 144 S.W.3d at 427–28.