**Opinion issued August 26, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-13-00870-CV**

_____

**HARRIS COUNTY, TEXAS, Appellant**

**V.**

**SOUTHERN COUNTY MUTUAL INSURANCE COMPANY, Appellee**

---

**On Appeal from the County Civil Court at Law No. 4**
**Harris County, Texas**
**Trial Court Case No. 1003917**

---

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellant, Harris County, Texas, challenges the trial court's order denying its summary-judgment motion in a suit for negligence brought against it by appellee, Southern County Mutual Insurance Company

---

[1]  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(5) (Vernon Supp. 2013).

("Southern"). In three issues, Harris County contends that the trial court, based on Harris County's governmental immunity, lacked subject-matter jurisdiction over Southern's suit.

We reverse the order of the trial court and render judgment dismissing Southern's suit against Harris County for want of jurisdiction.

## Background

In its original petition, Southern alleged that on August 18, 2010, Harris County Sheriff's Office ("HCSO") Deputy C. Hudson caused the patrol car that he was driving to collide with a parked car owned by Julieta Franeschi, Southern's insured. Southern considered the car a total loss and paid Franeschi's claim for property damages. Southern further alleged that Hudson, while acting within the course and scope of his employment, engaged in conduct that "involved an extreme degree of risk to the property of others" and acted with "conscious indifference to," or "reckless disregard for," the "rights, safety and welfare of others, such as [Franeschi]." It asserted that Harris County is liable as Hudson's employer for his "grossly negligent and/or reckless conduct."

Harris County answered and filed a summary-judgment motion, arguing that it is entitled to governmental immunity because Deputy Hudson had official immunity at the time of the collision.[2] Harris County argued that Hudson is

---

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. §101.021(1)(B) (Vernon 2011).

2

entitled to official immunity because, at the time of the collision, he was performing his duties in good faith and exercising discretion in responding to a life-threatening situation. Harris County attached to its summary-judgment motion Hudson's affidavit and deposition testimony; the affidavit of Harris County Constable's Office, Precinct Four, Captain Paul Staton; the HCSO accident report; and the County Auditor's accident report.

In his affidavit and deposition, Deputy Hudson testified that on August 18, 2010, upon being dispatched to an attempted suicide in progress about eight miles from his location, he activated the emergency lights and siren on his patrol car and drove down Magnolia Point Drive at an estimated speed of 80 to 90 miles per hour.[3] After about a "mile or two," Hudson hit a "bump" or "hump" in the road, lost control of his car, and hit a mailbox and a chain-link fence before finally hitting Franeschi's parked car.

In its response, Southern argued that Deputy Hudson, at the time of the collision, was not acting in good faith because he was traveling at approximately 80 miles per hour on a street with a posted speed limit of 30 miles per hour. It asserted that after the HCSO accident investigation, Hudson was found to be at fault and was reprimanded and suspended from duty. In support of its assertions,

---

[3]     According to the HCSO accident report, the posted speed limit for this area was 30 miles per hour.

Southern also attached Hudson's deposition and a copy of the HCSO accident report.

## Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex. 1995). When "deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true." *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex. 1985). "Every reasonable inference must be indulged in favor of the non-movant and any doubts [must be] resolved in its favor." *Id.* at 549. When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey,* 900 S.W.2d at 341; *Yazdchi v. Bank One, Tex., N.A.*, 177 S.W.3d 399, 404 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

## Governmental Immunity

In three issues, Harris County argues that the trial court erred in denying its summary judgment on the ground that the trial court lacked subject-matter jurisdiction over Southern's suit because Deputy Hudson, at the time of the

collision, was performing his duties in good faith and Southern "failed to offer legally sufficient proof to controvert [Harris County's] showing of good faith." Harris County asserts, thus, that Hudson had official immunity and it had governmental immunity from Southern's negligence claim.

Under the common-law doctrine of sovereign immunity, the state cannot be sued without its consent. *City of Hous. v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011). "Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the State, including counties, cities, and school districts." *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Like sovereign immunity, "governmental immunity has two components: immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether." *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) (footnote omitted). Governmental immunity from suit deprives a trial court of subject-matter jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004).

Under the doctrine of governmental immunity, Harris County cannot be liable for the torts of its officials like Deputy Hudson unless there is a waiver of immunity. *Mount Pleasant Indep. Sch. Dist. v. Estate of Lindburg*, 766 S.W.2d 208, 211 (Tex. 1989). The Texas Legislature has granted a limited waiver of

sovereign and governmental immunity for property damage caused by "the negligence of an employee acting within his scope of employment" if the injuries "arise[] from the operation or use of a motor-driven vehicle." TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(1)(A) (Vernon 2011). This waiver of immunity also requires proof that the "employee would be personally liable to the claimant according to Texas law." *Id.* § 101.021(1)(B). Conversely, if the employee is protected from liability because of official immunity, the governmental entity is shielded from liability on the basis of its sovereign or governmental immunity. *Univ. of Hous. v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000). Thus, if Hudson is immune from tort liability under the doctrine of official immunity, Harris County is also immune.

Generally, governmental employees are not personally liable for acts performed within the scope of their duties. *Alamo Workforce Dev., Inc. v. Vann*, 21 S.W.3d 428, 434 (Tex. 2000). They are entitled to official immunity from suit arising from (1) the performance of their discretionary duties (2) conducted within the scope of their authority and (3) in good faith. *Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). Official immunity is an affirmative defense, and a government official must plead and prove the above three elements. *Clark*, 38 S.W.3d at 580. If the government official does not prove each element of official immunity, the burden

6

does not shift to the plaintiff to come forward with controverting evidence. *Tex. Dep't of Pub. Safety* v. *Rodriguez*, 344 S.W.3d 483, 488–89 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Where the above three-part test for official immunity is satisfied, the employee and the government are protected from suit, even if they acted negligently. *DeWitt v. Harris Cnty.*, 904 S.W.2d 650, 653–54 (Tex. 1995).

Here, Southern, in its response to Harris County's summary-judgment motion, challenged only whether Deputy Hudson was acting in good faith when he caused his patrol car to collide with Franeschi's parked car.

In *Chambers*, the Texas Supreme Court articulated a standard of objective legal reasonableness for the measurement of a government official's good faith, without regard to the official's subjective state of mind. 883 S.W.2d at 656. To establish good faith, Harris County must demonstrate that a reasonably prudent officer, under the same or similar circumstances as Deputy Hudson, could have believed that his actions were justified. *Id.* That Hudson was negligent will not defeat good faith; the objective good-faith test "does not inquire into 'what a reasonable person *would have done*,' but into 'what a reasonable officer *could have believed*.'" *Telthorster*, 92 S.W.3d at 465 (quoting *Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 n.1 (Tex. 1997)). Thus, good faith is established as a matter of law when an official's factual recitation is otherwise supported by the evidence.

*Medina Cnty. Comm'rs Court v. Integrity Grp., Inc.*, 944 S.W.2d 6, 10 (Tex. App.—San Antonio 1996, no writ).

The *Chambers* good-faith standard is subject to a balancing test of two competing considerations: (1) the "need" for the official's actions versus (2) the "risk" entailed by the official's conduct. *Rodriguez*, 344 S.W.3d at 491–92; *City of Pasadena v. Belle*, 297 S.W.3d 525, 531 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The "need" consideration is determined by factors such as the seriousness of an offense or accident to which an officer is responding, whether the officer's immediate presence is necessary to prevent injury or loss of life, and the availability of reasonable alternative courses of action that could achieve a comparable result. *Wadewitz*, 951 S.W.2d at 467; *Rodriguez*, 344 S.W.3d at 491. The "risk" consideration is determined by the nature, severity, and likelihood of the harm the officer's actions could cause, and whether the risk of harm would be clear to a reasonably prudent officer. *Rodriguez*, 344 S.W.3d at 491. Thus, to establish it is entitled to summary judgment here, Harris County's summary-judgment evidence "must conclusively prove that a reasonably prudent officer in the same or similar circumstances [as Deputy Hudson] could have believed the need" to drive at 80 miles per hour to reach the scene of an attempted suicide "outweighed the risk of harm to the public." *See id.* at 495. The movant's

summary-judgment evidence must "establish facts upon which the court could base its legal conclusion." *Clark*, 38 S.W.3d at 586.

Once evidence of objective good faith is presented, "the nonmovant must meet 'an elevated standard of proof' to defeat the official immunity defense" by showing that "'no reasonable official *could have thought* that the facts were such that they justified the official's conduct.'" *Rodriguez*, 344 S.W.3d at 490–91 (quoting *Chambers*, 883 S.W.2d at 656–57). In other words, "the nonmovant must show that a public official in the same position 'could not have reasonably reached the decision in question.'" *Id.* at 491 (quoting *Chambers*, 883 S.W.2d at 657 n.7). We note that the official's actions are reviewed based on the facts known at the time of the incident, rather than on subsequently obtained evidence, putting the focus on "whether a reasonable official in light of the information possessed . . . at the time [he] acted could have believed the actions were justified." *Id.*

In his affidavit, Deputy Hudson testified, in pertinent part:

> 3.    On August 18, 2010 at approximately 2:30 pm I was on duty in my job as a Deputy Sheriff on patrol. . . . I received a priority one call from the Sheriff's Department dispatcher about a suicide in progress at a nearby residence. The residence was approximately six or eight miles from where I was when I received the call. . . .
>
> [4.]    When I received the call I activated my lights and sirens on my patrol car and proceeded toward the house where the attempted suicide had been reported.

5. When I was responding to the call, I had several decisions to make. Among these decisions were what route I should take and at what speed I should travel.

6. I decided to travel on Magnolia Point Dr. to get to the residence of the attempted suicide. I had traveled on this road before and was familiar with it and thought it would be the quickest and safest route to the site.

I also had discretion as to what speeds to drive when responding to the emergency. When I was travelling to the residence of the attempted suicide I was at times travelling at approximately 80 or 90 mph[] on Magnolia Point, although I am not sure of my exact speed when I had the accident. Even at 80 or 90 mph however I thought this was a safe and appropriate speed to travel under the circumstances. I could have driven at a slower speed but, weighing the need to respond to the emergency, thought this high rate of speed was safe.

7. I lost control over my vehicle when I hit a bump or hump in the road. There was no road sign for the bump or the hump. Generally these are marked by a street sign. In fact, shortly after my accident a street sign was placed by the side of this road warning drivers of the bump or the hump in the road.

8. I thought it was necessary to travel at a high rate of speed because it was necessary to get to the scene of the attempted suicide as soon as possible. In an attempted suicide, or any medical emergency, a few seconds or minutes in the response time may make a difference in whether the person attempting suicide lives or dies. In an attempted suicide it may be necessary to perform lifesaving maneuvers such as CPR or first aid on the person. I know how to perform these techniques. In addition, the family members of the person are sometimes very emotional when a suicide is being attempted and may not be able to perform emergency techniques themselves.

Although an ER unit is usually sent to the site of the attempted suicide, sometimes ER personnel will not enter the place where the suicide is being attempted because of security concerns. A law

10

enforcement officer needs to respond to the site of the emergency as soon as possible to secure it for the ER personnel.

Sometimes calls to law enforcement agencies are reported as suicides but after further investigation turn out to be a murder. From my experience in law enforcement I knew it was important to arrive at this site as soon as possible to preserve evidence and separate witnesses. Separation of witnesses is desirable so one witness's statement will not influence another witness's version of the events.

9. I also thought it was safe to drive as fast as I did. I thought that the need to reach the scene of the attempted suicide in the manner that I did, including driving at speeds of up to 8[0] or 90 mph[], outweighed the risks of taking a longer amount of time to get there. I had activated my emergency lights and sirens when I began the pursuit so as to give warning to other cars on this road. This incident took place at 2:30 pm in the afternoon so traffic was not heavy at this time of the day. In addition this street is in a rural part of Harris County and there is very little traffic on this street and very few residences. The streets were dry so the weather did not inhibit my patrol car. Visibility was also clear. In addition I have had experience in traveling at this rate of speed in my duties as a law enforcement officer.

10. In this instance, I thought that a reasonably prudent officer under the same or similar circumstances could have believed that the need to reach the scene of the attempted suicide in the same manner that I did was justified and outweighed any clear risk of harm to the public in not responding in this manner.

And in his deposition, which Harris County attached to its summary-judgment motion, Hudson testified that it was reasonable and safe for him to drive 80 miles per hour on Magnolia Point Drive at 2:30 p.m. because the weather conditions were clear and dry, it was a rural area, he was familiar with the road, and he had experience driving at a high rate of speed in his duties as a law enforcement officer.

11

In his affidavit, Captain Staton testified, in pertinent part:

> I am a deputy constable with the office of Harris County Constable Ron Hickman. I have been in law enforcement for approximately 37 years and have been with Constable Hickman's office for 22 years. I am currently an Administrative Captain and have 16 years' experience in patrol duties, including automobile accident investigations, some of which involved law enforcement officers. I estimate that I have investigated over one hundred accidents in my career, including approximately 50 involving law enforcement officers. In the past, my duties included investigation and review of accidents involving Precinct Four deputies. I have been a patrol deputy in the field and have responded to situations like the one Deputy Hudson did in this lawsuit where a law enforcement officer was needed at the scene of an attempted suicide or a medical emergency.
>
> In writing this affidavit I have reviewed the following materials:
>
> 1. Texas Peace Officer's Accident Report
> 2. Accident Report (County Auditor's Form)
> 3. Affidavit signed by Deputy Hudson
> 4. Deposition transcript of Christopher Hudson
>
> From the facts set out in the above referenced records, I am of the opinion that Deputy Hudson was acting in good faith when he attempted to drive to the scene of the attempted suicide on August 18, 2010 on Magnolia Point Drive in Harris County, Texas.
>
> As stated in his affidavit, Deputy Hudson thought the need to respond to the attempted suicide by traveling at a high rate of speed was necessary to reach the site in order to save the life of a person who might be dying.
>
> In my opinion, a reasonably prudent patrol deputy, under the same or similar circumstances as faced by Deputy Hudson, could have believed that the need to respond to the medical emergency outweighed any risk of harm to the public in taking this action.

A person who has attempted suicide may be in dire need of medical attention. A law enforcement officer may be needed at the scene to perform CPR or first aid, or possibly secure the premises until ER personnel arrive.

From the facts set out in the referenced records and deposition[], I am of the opinion and conclude that Deputy Hudson exercised good faith when he decided to travel to the site of the attempted suicide at a high rate of speed. I am of the opinion that a reasonably prudent officer, under the same or similar circumstances as faced by Deputy Hudson in this situation, could have believed that the need to arrive at the scene quickly outweighed the risk of harm to the public naturally resulting from that course of action.

In reaching my opinion, I considered the following matters as creating the need and urgency to respond as did Deputy Hudson on the occasion in question:

a. Deputy Hudson received a call that a person had attempted suicide by hanging himself. A person who has attempted to hang himself is obviously in need of medical attention. Even if the person has been cut down he may still be in need of medical attention. A law enforcement officer is trained to administer CPR and first aid and may be able to save a person's life. The longer it takes for the officer to arrive at the scene jeopardizes the safety of the person.

b. Based on the nature of the emergency that Deputy Hudson was responding to, I think a reasonably prudent officer could have believed it was necessary to drive as fast as he was driving. Law enforcement personnel were needed at the scene of the attempted suicide to secure the premises.

c. Deputy Hudson could of course have chosen not [to] drive at the speed he was going. An officer has discretion as to what speed he drives to an emergency. However, if an officer delays arriving at the scene of a medical emergency, it may lessen the chances that a person will survive.

In reaching my opinion that Deputy Hudson was acting in good faith, I know that when a peace officer drives at a speed that is above the speed limit, even 80 to 90 mph, it can create the risk of an accident

13

and harm to others. However the risk is less when, as was the situation on this occasion, the area is rural and the streets are dry. I also note that Deputy Hudson activated his lights and sirens. By activating his emergency equipment he would have warned other vehicles that he was coming. This response also took place in the daytime with clear visibility, which was safer than driving at this rate at night. In addition the cause of the accident was actually the hump or bump in the road rather than the speed at which Deputy Hudson was driving.

From the information I have reviewed I believe that Deputy Hudson was acting in good faith and doing what a reasonably prudent law enforcement officer could have believed was necessary in attempting to arrive at the site of the attempted suicide as soon as possible and trying to save the life of the person who had attempted suicide.

In their testimony, Deputy Hudson and Captain Staton address both considerations of the *Chambers* good-faith test. In his affidavit, Hudson averred that he made the decision to travel on Magnolia Point Drive because he was familiar with it and "thought it would be the quickest and safest route to the site." He noted that he made the decision to drive 80 miles per hour based on the need to respond to the emergency. And because an attempted suicide is a medical emergency, it was necessary to get to the scene "as soon as possible"; "a few seconds or minutes in the response time may make a difference in whether the person attempting suicide lives or dies." He further explained that even if a person attempting suicide has been stopped, the person might still require medical attention. And family members or emergency personnel may be unable to perform lifesaving measures because of emotional reactions and security concerns, making

14

it necessary for law enforcement to respond as soon as possible. Thus, Hudson's testimony demonstrates that he assessed the need for his action by considering the seriousness of the situation and the necessity for his immediate presence at the scene of the attempted suicide.

Deputy Hudson also testified about alternative courses of action that he could have taken to achieve a comparable result and his assessment of the pertinent risks involved. He explained that he considered the alternative action of taking a different route and driving at a slower speed, but he thought the need to drive at 80 to 90 miles per hour outweighed the risk of taking a longer amount of time to get to the scene and he had activated his emergency lights and siren to warn other cars on the road.

In regard to risk, Deputy Hudson opined that the risk involved in speeding to the scene was decreased because of the dry weather conditions that existed at the time with clear visibility and very little traffic. Hudson explained that he had experience driving his patrol car at high speeds and had activated his emergency lights and siren in order to warn others that he was approaching.

The Texas Supreme Court in *Clark* explained that the assessment of risk may be established by affidavit testimony showing that the officer in question assessed the specific circumstances affecting the risk involved in his chosen course of action such as time of day, traffic, and weather and road conditions. 38 S.W.3d

at 586–87. Hudson noted his belief that a reasonably prudent officer under the same or similar circumstances could have believed that the need to reach the scene of the attempted suicide in the manner in which he did was justified and outweighed any clear risk of harm to the public in not responding in this manner.

Captain Staton explained that he based his opinion of Deputy Hudson's actions upon his review of Hudson's affidavit and deposition testimony, the HCSO accident report, and the County Auditor's accident report. Staton averred that "a reasonably prudent patrol deputy, under the same or similar circumstances as faced by Deputy Hudson, could have believed that the need to respond to the medical emergency outweighed any risk of harm to the public in taking this action." Staton explained that a law enforcement officer may be needed to perform CPR or first aid and to secure the premises. He also discussed the alternative course of action that Hudson could have taken by choosing not to drive at a higher speed, but noted that delaying the arrival at the scene "may lessen the chances that a person will survive." And Staton discussed the factors that decreased the risk that Hudson took by speeding, i.e., the dry weather conditions with clear visibility. He further noted that the collision occurred in the daytime in a rural area, while Hudson had his emergency lights and siren activated to warn other drivers. Finally, Staton opined that Hudson, at the time of the collision, was acting in good faith and "doing what a reasonably prudent law enforcement officer could have believed was

16

necessary in attempting to arrive at the site of the attempted suicide as soon as possible and trying to save the life of the person that had attempted suicide."

We conclude that Harris County's summary-judgment evidence includes facts that conclusively establish that a reasonable police officer, acting under the same or similar circumstances as Deputy Hudson was at the time of the collision, would have believed the decision to travel at a speed of 80 miles per hour to a suicide in progress was justified. The summary-judgment evidence addresses the *Wadewitz* factors, and both Hudson and Captain Staton articulate the facts upon which their conclusions are reasonably based. Accordingly, we hold that Harris County established Deputy Hudson's good faith as a matter of law. *See Wadewitz*, 951 S.W.2d at 467.

Because Harris County's evidence established Deputy Hudson's good faith conclusively, the burden shifted to Southern to controvert that evidence by raising a genuine issue of material fact. To controvert Harris County's summary-judgment evidence on good faith, Southern had to show that no reasonable officer in Deputy Hudson's position could have thought that the facts justified his actions. *Clark*, 38 S.W.3d at 581. Southern asserts that Harris County's own conflicting evidence establishes genuine issues of material fact as to whether Hudson was responding to an actual emergency and was familiar with the area.

17

In his affidavit and deposition testimony, Deputy Hudson stated that he was responding to a "priority one" call concerning a "suicide in progress" at a nearby residence. However, the HCSO accident report, attached to both Harris County's summary-judgment motion and Southern's response, states that the person attempting suicide had been "cut down." Nevertheless, Hudson stated in his affidavit testimony that he was responding to a "suicide in progress." The *Chambers* good-faith test is "based on the officer's perception of the facts at the time of the event." *Wadewitz*, 951 S.W.2d at 467; *see also Chambers*, 883 S.W.2d at 656. Southern did not present any evidence controverting Harris County's evidence that Hudson thought he was responding to an attempted suicide.

Deputy Hudson also stated in his affidavit testimony that he chose to drive on Magnolia Point Drive because he "had traveled on this road before and was familiar with it and thought it would be the quickest and safest route to the site." He further testified in his deposition that he was familiar with the area because he had patrolled that "beat" and he had driven on Magnolia Point Drive "two or three" times. Although Southern asserts that this evidence does not prove Hudson's degree of familiarity with the area, it attached no controverting evidence to its summary-judgment response.

Finally, Southern asserts that its evidence that Deputy Hudson received a reprimand and one-day suspension for the collision conclusively establishes that

18

his actions "were grossly negligent and/or reckless." Southern further asserts that this evidence demonstrates that at least one other officer, Hudson's commanding officer, and an accountability board, would not have acted as Hudson acted. However, Southern misstates what it is required to show. To controvert Harris County's summary-judgment evidence on good faith, Southern had to do more than show that a reasonably prudent officer could have reached a different decision; it had to show that *no* reasonable officer in Deputy Hudson's position could have thought that the facts justified his actions. *Clark*, 38 S.W.3d at 581. Additionally, an officer's good faith is not rebutted by evidence that he violated the law or department policy by taking the chosen action. *Vasquez v. City of San Antonio*, No. 04-05-00707-CV, 2006 WL 1539636, at *4 (Tex. App.—San Antonio June 7, 2006, no pet.) (mem. op.); *Johnson v. Campbell*, 142 S.W.3d 592, 596 (Tex. App.—Texarkana 2004, pet. denied).

Harris County conclusively established, and Southern's summary-judgment evidence did not controvert, that Deputy Hudson acted in good faith at the time of the collision. Accordingly, we hold that the trial court erred in denying Harris County's summary judgment on the ground that the trial court did not have subject-matter jurisdiction over Southern's suit.

We sustain Harris County's first, second, and third issues.

19

## Conclusion

We reverse the order of the trial court and render judgment dismissing Southern's suit against Harris County for want of jurisdiction.


Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.