**Opinion issued August 8, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00709-CV

————————————

**CITY OF HOUSTON, Appellant**

**V.**

**KIA D. EDWARDS, Appellee**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-32604**

---

## MEMORANDUM OPINION

Appellee Kia Edwards alleges that she was injured when a City of Houston police car collided first with a City of Houston fire engine and then with her vehicle. Edwards sued the City, which asserted immunity in a traditional motion

for summary judgment. The trial court denied the motion. On appeal, the City asserts that the trial court erred by denying the motion for summary judgment because Edwards's claims are barred by the emergency exception to the limited waiver of immunity in the Texas Tort Claims Act ("TTCA") and by the doctrine of official immunity. *See* TEX. CIV. PRAC. & REM. CODE § 51.014 (a)(5) (authorizing interlocutory appeal of denial of "a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state"); *id.* § 51.014 (a)(8) (authorizing interlocutory appeal from order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined" in TTCA); *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018) (noting that "[i]mmunity from suit may be asserted through a plea to the jurisdiction or other procedural vehicle, such as a motion for summary judgment"). We reverse the trial court's order, and we render judgment dismissing Edwards's claims against the City.

**Background**

Late afternoon, on a clear summer day, Houston Police Officer D. Moore heard Houston Police Officer Z. DeGrange announce over the radio that he was pursuing a suspect on foot in the district where Officer Moore normally patrolled. Officer Moore, who was on duty and wearing his uniform, immediately responded to the request for assistance by activating lights and sirens in his marked police car.

2

After determining what route to take, he drove south on Emancipation Avenue toward Officer DeGrange's position to provide backup support. Although the speed limit on that stretch of Emancipation Avenue was 35 miles per hour, Officer Moore drove approximately 65 miles per hour. Emancipation Avenue is a four-lane road, with two lanes in each direction. Officer Moore drove in the right-hand lane, crossing several intersections with a green light. He slowed to approximately 20 miles per hour when he approached the red light at the intersection of Emancipation Avenue and Elgin, proceeding through the intersection after checking both ways.

Officer Moore approached an intersection with Cleburne Street, a two-lane road, with one lane in each direction (east and west). To reach his destination, Officer Moore intended to proceed straight through the intersection. As he approached the intersection, he saw a Houston Fire Department fire engine ahead of him. According to Officer Moore's affidavit, the fire engine was in the left lane approaching Cleburne Street. Officer Moore saw the fire engine pull toward the left, and he believed that it was yielding the right of way to him.

As Officer Moore approached the intersection, he saw that the light was green, although it turned yellow about one second before he entered the intersection. Officer Moore, who averred that he was familiar with the timing of the stoplight at Emancipation Avenue and Cleburne Street because he patrolled

3

that area, determined that he could proceed through the intersection before the light turned from yellow to red.

As Officer Moore began to enter the intersection, he saw the firetruck move to the right toward his lane. Trying to avoid an accident, he turned the steering wheel toward the right. According to Officer Moore, the fire engine made contact with the police car, which then collided with Edwards's 2007 Silver GMC Yukon, which was stopped at the light on Cleburne Street facing west.

Houston Fire Department Engineer Operator E. Marquez was driving the reserve fire engine that collided with Officer Moore's patrol car. At the beginning of his shift, he ensured that the fire engine passed a safety inspection. Around the time Officer Moore received a call to assist an officer, Engineer Operator Marquez received an unrelated medical emergency call to an apartment complex located at the intersection of Emancipation Avenue and Cleburne Street. He responded to the medical emergency call, driving the reserve fire engine with lights and sirens activated. As he approached the intersection of Emancipation Avenue and Cleburne Street, where he intended to turn right to reach his destination, he checked his exterior side mirrors and verified that there were no approaching vehicles.

To turn right, Engineer Operator Marquez determined that he needed to occupy both the left and right lanes to safely turn. Engineer Operator Marquez

4

slowed the fire engine to about five or ten miles per hour as he entered the intersection. As he began to turn, he saw Officer Moore's patrol car approaching with lights activated. In his affidavit, Engineer Operator Marquez stated that he did not hear an approaching siren while his siren was activated. Marquez applied the brake and brought the fire engine to a complete stop. The patrol car and fire engine "made contact," and the patrol car continued onto Cleburne Street, where it struck Edwards's stopped vehicle.

The Houston Police Department crash report states that both the fire engine and the patrol car were traveling southbound with lights and sirens on Emancipation Avenue in the right-hand lane. The report further states that the fire engine swung left as it began to turn right onto Cleburne Street. The report asserts that the police patrol car was "traveling at an unsafe speed, failed to pass to the right safely[,] [and] failed to use due caution."

Edwards sued the City of Houston, Marquez, and Moore. All the defendants filed special exceptions asserting that Edwards had not alleged a waiver of the City's governmental immunity. The City moved to dismiss the claims against Marquez and Moore under dismissal provisions in the TTCA.[1] In response, Edwards nonsuited her claims against Marquez and Moore. The City then filed

---

[1] *See* TEX. CIV. PRAC. & REM. CODE §101.106(e).

5

special exceptions requesting that Edwards be required to plead with specificity a waiver of the City's governmental immunity.

The City moved for summary judgment based on immunity. It argued that it was shielded by the official immunity of its employees, whom it maintains were performing discretionary duties, within the scope of their authority, and in good faith at the time of the collision. The City also asserted that it was immune under the emergency exception to the waiver of immunity under the TTCA. Specifically, it argued that both employees were reacting to emergency situations, complying with applicable law, and not behaving recklessly.

As summary-judgment evidence, the City attached affidavits from Officer Moore, Houston Police Department Sergeant R. Dunn, Engineer Operator Marquez, and Houston Fire Department District Chief C. Gordon. The City also attached the crash report and supplied a copy of the video from Officer Moore's body-worn camera video from the day of the collision.

Officer Moore's affidavit stated that he had responded to a call for assistance from an officer who was engaged in a foot pursuit, which is a "Code E" priority that warrants an emergency response. Officer Moore stated that he used his discretion to determine which route to drive to respond to the call and how fast to drive. He stated that in deciding to drive 65 miles per hour where the speed limit was 35 miles per hour, he considered and balanced the need to arrive quickly and

6

"potential for injury or loss of life to a police officer" with the risks inherent in speeding, considering the time of day, light traffic conditions, good visibility, dry streets, and good weather. He asserted that he was not distracted by his cell phone, the radio, or the computer in his patrol vehicle. He also described the factors he considered in deciding to proceed into the intersection of Emancipation Avenue and Cleburne Street against a yellow light, and the evasive maneuvers he engaged in to minimize damage and potential injury from a collision.

Sergeant Dunn reviewed the events of the day of collision and offered an opinion based on his nearly 17 years of experience and extensive training. He stated that his opinions were based on his knowledge, skill, experience, training, and education as a police officer as well as [his] personal conversations with Officer [] Moore, [his] evaluation of the events and circumstances of the accident at issue as the responding supervisor on the scene, and [his] review of the following: Officer [D.] Moore's body-worn camera footage, his affidavit for this case, and the crash report. Sergeant Dunn opined that Officer Moore behaved reasonably in response to the call for assistance, and he complied with the law applicable to driving in an emergency situation. He opined that Officer Moore's maneuvers minimized the damage and potential for injury from what he called "an unfortunate accident." Sergeant Dunn also averred that under the circumstances, "another reasonably prudent law enforcement officer, including myself," would

have been justified in operating the patrol car using emergency response procedures as Officer Moore did.

Engineer Operator Marquez stated that he responded to a call about a medical emergency and drove the reserve fire engine with lights and sirens after ensuring that the vehicle passed safety inspection. He explained that he needed to exceed the speed limit by approximately 5 miles per hour due to the urgency and priority of the call for assistance. Like Officer Moore, Marquez averred that he considered weather, road and traffic conditions, and his experience and training, which he balanced against the need to respond quickly. He stated that he cared about the safety of others, and that he determined that the need to promptly respond to a medical emergency outweighed the risk of harm to others from his driving.

Chief Gordon was the responding district chief on the scene of the accident. Like Sergeant Dunn, Chief Gordon reviewed the events of the day of collision and offered an opinion based on his more than 32 years of experience and extensive training. He stated that his opinions were based on his

> knowledge, skills, experience, training, and education as a firefighter as well as [his] personal conversations with [E.] Marquez, [his] evaluation of the events and circumstances of the accident at issue as the responding district chief on the scene, and [his] review of the following: [E.] Marquez'[s] affidavit for this case, the body worn camera footage of Officer [D.] Moore, the Hospital/Patient PCR record for Engine 007, and the crash report.

Chief Gordon opined that Marquez behaved reasonably in response to the medical emergency call and his actions were "reasonable and proper under the circumstances." Chief Gordon also opined that Marquez complied with the law applicable to driving in an emergency situation. He further stated that "another reasonably prudent fire fighter, including myself, under the same or similar circumstances, could have believed that the need to operate a fire engine at the level of an emergency response outweighed any minimal risk of harm to others . . . ." Chief Gordon stated that Marquez's actions were justified and reasonable based on "his perception of the facts at the time," and that Marquez took precautions to avoid or minimize risk of injury to others by driving carefully, activating lights and siren, and trying to avoid the accident. Finally, he stated that Marquez "acted with due regard for the safety of others, and . . . with good faith throughout his emergency response."

The video of the body-worn camera footage was not filed in this Court, despite an order from the Court to do so. However, based on the parties' representations, the footage included an audio recording with several statements that the parties do not dispute. First, about 30 seconds before the crash, DeGrange announced over the radio that he had detained the suspect. Second, several seconds later, a question was asked about whether the suspect had been secured, and no answer was given before the collision. Third, just after the collision, there was an

announcement that the suspect was in handcuffs, but: "It's not over, keep going Code 2."

Edwards amended her petition and filed a response to the motion for summary judgment. In her amended petition, Edwards alleged that Officer Moore was not responding to an emergency at the time of the collision, and that he acted without good faith and with conscious indifference to the rights, safety, and welfare of others. Edwards alleged that the reserve fire engine posed "an unreasonable and inherently dangerous risk to the public," because the engine was so loud that a firefighter inside the vehicle could not hear any sounds–including a police siren–originating outside the fire engine. She alleged that both Officer Moore and Engineer Operator Marquez committed the offense of reckless driving, and they filed to execute their ministerial duties as a reasonably prudent officer or firefighter or failed to execute discretionary duties in good faith. She also alleged that Officer Moore was speeding.

Edwards responded to the motion for summary judgment, but she did not provide any evidence. Instead, she questioned the City's summary-judgment evidence, speculating about statements in the City's supporting affidavits and contrasting Marquez's actions with Officer Moore's. A photograph of a vehicle's dashboard speedometer is embedded in the response, but it is not clear what the photograph shows or how it is relevant to the motion for summary judgment.

Edwards conceded that Engineer Officer Marquez was responding to an emergency at the time of the accident, but Edwards argued that Officer Moore was not responding to an emergency at the time of the accident. She based this argument on the audio recording from Officer Moore's body-worn camera. She asserted that the emergency had ended about 30 seconds before the collision because of the radio transmission announcing that the suspect had been detained. She therefore argued that Officer Moore was performing a ministerial duty by driving his patrol vehicle, for which he did not have official immunity.

The trial court denied the motion for summary judgment, and the City appealed.

## Analysis

On appeal, the City raises two issues, arguing that the trial court erred when it failed to apply the emergency exception to bar Edwards's claims and that the trial court erred by failing to find that both employees had official immunity.

## I.      Standards of review

We apply a de novo standard of review to statutory construction, rulings on motions for summary judgment, and determinations of governmental immunity. *Garza v. Harrison*, 574 S.W.3d 389, 400 (Tex. 2019) (statutory construction); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018) (summary judgment);

*Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009) (governmental immunity).

The party moving for traditional summary judgment must show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021). On appeal, our review of a trial court's summary-judgment ruling is limited to the evidence and arguments presented to the trial court.[2] *See*

---

[2] On appeal, the City asks this Court to take judicial notice of Houston Police Department General Order No. 600-01 (July 17, 2014) (amended June 19, 2020), which pertains to "Response Management." The document was attached to the City's brief as an appendix. A court of appeals has the power to take judicial notice for the first time on appeal. *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 878 S.W.2d 598, 600 (Tex. 1994). In general, a court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." TEX. R. EVID. 201(b) ("Kinds of Facts That May be Judicially Noticed."). Typically, appellate courts take judicial notice of facts outside the record when it is necessary to determine jurisdiction on appeal or ancillary matters. *See Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 624 (Tex. 2012) (citing *SEI Bus. Sys., Inc. v. Bank One Tex., N.A.*, 803 S.W.2d 838, 841 (Tex. App.—Dallas 1991, no writ)).

Here, the City offers the document in support of its motion for summary judgment. On appeal, our review of a trial court's summary-judgment ruling is limited to the evidence and arguments presented to the trial court. *See NMRO Holdings, LLC v. Williams*, No. 01-16-00816-CV, 2017 WL 4782793, at *5 (Tex. App.—Houston [1st Dist.] Oct. 24, 2017, no pet.) (mem. op.) (citing *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 730–31 (Tex. App.—San Antonio 2014, pet. denied); *accord Salazar v. Ramos*, 361 S.W.3d 739, 745 (Tex. App.—El Paso 2012, pet. denied) ("Our review is limited to consideration of the evidence presented to the trial court."). We decline to take judicial notice of the adjudicative facts in HPD General Order No. 600-01 because this order was not presented to the trial court. *See NMRO Holdings*, 2017 WL 4782793, at *5; *see also* TEX. R. CIV. P. 166a(c).

*NMRO Holdings, LLC v. Williams*, No. 01-16-00816-CV, 2017 WL 4782793, at \*5 (Tex. App.—Houston [1st Dist.] Oct. 24, 2017, no pet.) (mem. op.) (citing *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 730–31 (Tex. App.—San Antonio 2014, pet. denied); *accord Salazar v. Ramos*, 361 S.W.3d 739, 745 (Tex. App.—El Paso 2012, pet. denied) ("Our review is limited to consideration of the evidence presented to the trial court.").

"When a governmental unit, as the movant, raises the affirmative defense of governmental immunity and challenges the trial court's subject-matter jurisdiction in a summary-judgment motion, it must establish that it is entitled to governmental immunity as a matter of law." *City of Hous. v. Carrizales*, No. 01-20-00699-CV, 2021 WL 3556216, at \*3 (Tex. App.—Houston [1st Dist.] Aug. 12, 2021, pet. denied) (mem. op.). "Once the governmental unit conclusively establishes its entitlement to governmental immunity, the burden shifts to the non-movant to present evidence sufficient to create a fact issue on at least one element of either the affirmative defense or an exception to that defense." *Id.*; *see also City of San Antonio v. Maspero*, 640 S.W.3d 523, 529 (Tex. 2022) ("The plaintiff bears the burden of negating Section 101.055's applicability."). "If the non-movant cannot meet his burden, the suit is barred because of governmental immunity, and summary judgment is proper." *Id.*

## II. Governmental immunity

### A. Generally

"Governmental units are immune from suit unless immunity is waived by state law." *Maspero*, 640 S.W.3d at 528 (citing *Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003). Governmental immunity, like sovereign immunity from which it is derived, exists to protect political subdivisions, such as municipalities, from suit and liability for monetary damages. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655, (Tex. 2008) ("*Mission Consol. I*"). Governmental immunity deprives a trial court of subject matter jurisdiction over lawsuits in which the State's political subdivisions have been sued unless immunity is waived by the Legislature. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012) ("*Mission Consol. II*"); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). "We interpret statutory waivers of immunity narrowly, as the Legislature's intent to waive immunity must be clear and unambiguous." *See Mission Consol. I*, 253 S.W.3d at 655 (citing TEX. GOV'T CODE § 311.034). Thus, we initially focus exclusively on the statute permitting a party to sue the state, without regard to evidence of injury or the need for a party to have a remedy for a violation of his rights. *See id.*

**B.     Waiver of immunity under the TTCA**

The Legislature has expressly waived immunity to the extent provided by the Texas Tort Claims Act. *See Mission Consol. I*, 253 S.W.3d at 655; *see* TEX. CIV. PRAC. & REM. CODE §§ 101.001–.109 (TTCA). The TTCA generally waives governmental immunity for "property damage, personal injury, and death:

> (1)     property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
>> (A)     the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
>>
>> (B)     the employee would be personally liable to the claimant according to Texas law . . . .

TEX. CIV. PRAC. & REM. CODE § 101.021(1).

**III.     Official immunity**

"Because the Act provides that a governmental unit may only be liable when 'the [negligent] employee would be personally liable to the claimant,' whether the employee is entitled to official immunity also affects whether the [TTCA's] limited waiver of governmental immunity applies." *City of Houston v. Nicolai*, No. 01-20-00327-CV, 2023 WL 2799067, at *4 (Tex. App.—Houston [1st Dist.] Apr. 6, 2023, no pet. h.) (en banc) (opinion) (quoting TEX. CIV. PRAC. & REM. CODE § 101.021(1)). "If the employee is protected from liability by official immunity, the employee is not personally liable to the claimant and the government retains its

15

[governmental] immunity under [Section 101.021(1)]." *DeWitt v. Harris Cnty.*, 904 S.W.2d 650, 653 (Tex. 1995). "A governmental employee is entitled to official immunity: (1) for the performance of discretionary duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good faith." *Univ. of Hous. v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000); *Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723, 726 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). "Because official immunity is an affirmative defense, the City must prove each element of the defense." *Nicolai*, 2023 WL 2799067, at *4 (citing *Clark*, 38 S.W.3d at 580).

The parties do not dispute that Officer Moore and Engineer Operator Marquez were both acting within the scope of their authority at the time of the collision. We therefore focus on the first and third elements of official immunity.

### A.    Discretionary function

If a governmental employee, such as a law enforcement officer, is performing a discretionary act within the scope of his public duties and in good faith, he is protected by official immunity, no matter if he was negligent in the exercise of those duties. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994); *Nicolai*, 2023 WL 2799067, at *4. An action is discretionary if it involves personal deliberation, decision, and judgment. *Ramos*, 35 S.W.3d at 727 (citing *Chambers*, 883 S.W.2d at 654). But an action that requires obedience to

orders or the performance of a duty for which the employee has no choice is ministerial. *Id.* The distinction between discretionary and ministerial acts can be narrow because any official act that is ministerial will still require the employee's discretion to execute it. *Id.* In determining whether an act is discretionary, the focus is on whether an employee was performing a discretionary function—not whether the employee had the discretion to do an allegedly wrongful act while discharging that function, or whether the job description at issue includes discretionary duties. *Id.*

A law enforcement officer's operation of a motor vehicle can be discretionary or ministerial, depending on the circumstances. *See Nicolai*, 2023 WL 2799067, at *5. An officer's operation of a motor vehicle is considered a discretionary function during "high-speed chases, investigations, traffic stops, and the decision to violate traffic laws to quickly reach the scene of suspected criminal activity or assist another officer there." *Id.* (citing *Chambers*, 883 S.W.2d at 655). "In emergency or other evolving situations, officers retain official immunity because of their performance of discretionary acts, so long as the other immunity elements are met." *Id.* (citing *Hulick v. City of Hous.*, No. 14-20-00424-CV, 2022 WL 288096, at *3 (Tex. App.—Houston [14th Dist.] Feb. 1, 2022, pet. denied) (mem. op.)). On the other hand, "[s]imple, nonemergency driving by a police officer while on official business is a ministerial act that does not entitle the officer

17

to official immunity." *City of Houston v. Hatton*, No. 01-11-01068-CV, 2012 WL 3528003, at *3 (Tex. App.—Houston [1st Dist.] Aug. 16, 2012, pet. denied) (mem. op.). "This is because ordinary driving, unlike the pursuit and apprehension of suspects or an urgent backup-call response, does not require an officer to perform law enforcement functions involving discretion and judgment that affect how [he] uses h[is] police vehicle." *Nicolai*, 2023 WL 2799067, at *5.

In this case, Edwards does not dispute that Marquez was responding to an emergency, nor does she assert that Marquez was engaged in a ministerial function at the time of the collision. The City's evidence demonstrates that Marquez was en route to a medical emergency, responding with lights and sirens activated, at the time of the collision. The City demonstrated that Marquez was engaged in a discretionary function.

Here, Edwards maintains that Officer Moore was performing a ministerial function of operating a patrol vehicle at the time of the collision. This is based on her contention that the emergency to which Officer Moore initially responded ended about 30 seconds before the collision. The City's evidence demonstrates that Officer Moore was responding to a radio broadcast requesting assistance for Officer DeGrange, who was engaged in a foot pursuit of a suspect. Officer Moore was not required to respond. Officer Moore was familiar with the area of the pursuit because it was in his district, and he traveled those roads often. He decided

18

to respond to provide backup assistance to Officer DeGrange. Edwards presented no evidence to contradict Officer Moore's affidavit or the City's evidence. Instead, Edwards argued that a radio broadcast about 30 seconds prior to the collision indicated that the need for backup assistance had ended. But Edwards also presented no evidence to support this conclusion. And mere speculation cannot defeat competent summary-judgment evidence. *See Ybarra v. Ameripro Funding, Inc.*, No. 01-17-00224-CV, 2018 WL 2976126, at *6 (Tex. App.—Houston [1st Dist.] June 14, 2018, pet. denied) (mem. op.). Moreover, "case law teaches that an officer may perform a discretionary act while driving even in circumstances that do not rise to the level of an emergency." *See Ramos*, 35 S.W.3d at 727–29 (holding that officer performed discretionary act by conducting driving test because he exercised judgment regarding how and when to conduct test).

We conclude that Officer Moore was performing a discretionary function at the time of the collision because he was responding to an emergent and evolving situation. *See Nicolai*, 2023 WL 2799067, at *5; *Collins v. City of Houston*, No. 14-13-00533-CV, 2014 WL 3051231, at *5 (Tex. App.—Houston [14th Dist.] July 3, 2014, no pet.) (mem. op.) (holding that police officer was performing discretionary function at time of accident when responding to radio broadcast requesting assistance, and although officer not required to respond, he chose to do so because he was near destination).

19

**B.     Good faith**

The Texas Supreme Court has instead adopted an objective standard for good faith in the context of official immunity. *Chambers*, 883 S.W.2d at 656; *see Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d at 417, 419 (Tex. 2004) (stating courts do not consider subjective evidence of good faith); *Tex. Dep't of Pub. Safety v. Rodriguez*, 344 S.W.3d 483, 489 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Good faith for official immunity is not measured by the official's subjective intent.").

"The objective good faith element of the official immunity defense requires the defendant official to prove that a reasonable official under the same or similar circumstances could have believed the defendant's conduct was justified." *Rodriguez*, 344 S.W.3d at 490 (citing *Chambers*, 883 S.W.2d at 656–57). "The test does not require the officer to prove what a reasonably prudent officer should or should not have done" because proof of negligence does not demonstrate the absence of good faith under *Chambers*. *Rodriguez*, 344 S.W.3d at 490.

"[A]n officer acts in good faith in a pursuit case if: a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *Chambers*, 883 S.W.2d at 656. The Supreme Court elucidated the need and risk aspects of the test, saying:

20

The "need" aspect of the test refers to the urgency of the circumstances requiring police intervention. In the context of an emergency response, need is determined by factors such as the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result. The "risk" aspect of good faith, on the other hand, refers to the countervailing public safety concerns: the nature and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer.

*Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex. 1997); *see Clark,* 38 S.W.3d at 582 (holding that need and risk factors apply to good faith determinations in police pursuits and emergency responses).

Courts review the official's actions based on the facts known at the time rather than by hindsight or subsequent evidence. *Rodriguez*, 344 S.W.3d at 491. Expert testimony about an official's good faith must address the need and risk factors in addition to what a reasonable, prudent officer could have believed under the circumstances. *City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 321 (Tex. 2007). The nonmovant opposing a claim of official immunity must meet "an elevated standard of proof" by showing that "no reasonable official *could have thought* that the facts were such that they justified the official's conduct." *Chambers*, 883 S.W.2d 656–57 (emphasis added); *see Rodriguez*, 344 S.W.3d at 490–91.

21

### 1. Engineer Operator Marquez

The City demonstrated that Marquez had official immunity. In his affidavit, Marquez expressly addressed the need and risk factors. As to need, he averred that while on duty, his unit "received a medical emergency call" to a location approximately two miles from his fire station. He stated: "A medical emergency call is a high priority call due to the potential for loss of life or injury." This indicates that the need for a response was high. As to risk, Marquez detailed the factors he considered when operating with lights and sirens. He considered that "it was daylight, the weather was clear, that there was little traffic, and that the roads were dry," and he determined "that it was safe to proceed to the call a[s] an emergency response." He stated that he took "the most direct and efficient route" to reach his destination, and that he traveled with lights and sirens activated. He attested that he believed it was necessary to exceed the 35 miles per hour speed limit by about 5 miles per hour "to immediately get to the scene of a medical emergency call due to the potential for injury or loss of life." He believed it was safe to do so considering the weather and traffic conditions and clear visibility. He also averred that he was not distracted by a cell phone, radio, or computer. Marquez said that he slowed his vehicle to "approximately 5 to 10 miles per hour" before entering the intersection at Emancipation Avenue and Cleburne Street, and that he checked his side view mirrors before entering the intersection and again

22

after he began his turn. He also stated that he quickly "hit the brake" and brought the fire engine to a complete stop once he saw Officer Moore's vehicle. He opined that "a reasonably prudent firefighter under the same or similar circumstances could have believed that [his] actions were justified based on [his] perception of the facts at the time and that the need to immediately arrive to the scene of a medical emergency outweighed any minimal risk of harm to others from [his] own driving."

Chief Gordon's affidavit was essentially the same. He averred that he reviewed Marquez's affidavit, Officer Moore's body-worn camera footage, his own evaluation as the responding district chief on the scene, the hospital/patient record for the fire engine, and the crash report. Chief Gordon detailed the same need and risk factors and facts, and he concluded that "a reasonably prudent firefighter under the same or similar circumstances could have believed that [Engineer Operator] Marquez'[s] actions were justified based on his perception of the facts at the time and that the need to immediately arrive to the scene of a medical emergency outweighed any minimal risk of harm to others from his own driving."

We conclude that this evidence demonstrates that Marquez acted in good faith because a reasonably prudent firefighter could have believed that the need to immediately respond to a medical emergency outweighed the clear risk of harm to

23

the public in operating a fire engine in an emergency response. *See Clark*, 38 S.W.3d at 582; *Wadewitz*, 951 S.W.2d at 467; *Chambers*, 883 S.W.2d at 656.

In the trial court, Edwards presented no controverting summary-judgment evidence. Edwards argued that Marquez failed to act in good faith "because he was well aware of the dangerous and unreasonable risks the reserve fire truck posed to the general public and, yet, proceeded without the necessary alertness required to operate the vehicle." She relied on Marquez's testimony that he did not see Officer Moore's lights until he began making the turn at the intersection. She argued:

> If you are essentially driving without hearing, your vision and awareness *have* to be on full alert. It is the same reason peace officers give traffic tickets to people who are wearing headphones while driving—because it is incredibly unsafe. When you cannot hear what is going on around you, you can miss a lot of noise that could alert you to impending danger. . . . [Marquez] needed to drive with more awareness of his surroundings. He should have noticed [Officer] Moore's lights well-before the accident intersection, which would have allowed him to either slow up or stop and let [Officer] Moore pass. He did not, and that lack of good faith, caused or contributed to the accident and Plaintiff's injuries.

Here, Edwards has essentially argued that Engineer Operator Marquez was negligent. But proof of negligence does not demonstrate the absence of good faith under *Chambers*. *Rodriguez*, 344 S.W.3d at 490. Moreover, she did not meet the elevated standard of proof or show that no reasonable official could have thought that the facts justified Marquez's conduct. *See Chambers*, 883 S.W.2d at 656–57; *see Rodriguez*, 344 S.W.3d at 490–91. We hold that Edwards failed to carry her

24

summary-judgment burden to create a genuine question of material fact on the element of good faith. We, therefore, further hold that Marquez is entitled to official immunity.

## 2.    Officer Moore

The City demonstrated that Officer Moore had official immunity. In his affidavit, Officer Moore expressly addressed the need and risk factors. As to need, he averred that while on duty, he heard Officer DeGrange "announce over the radio that he had a suspect running from him on foot" in Officer Moore's district. He further averred:

> Because of the immediate nature of a suspect running from an officer, officers typically do not have time to announce over the radio the reason as to why the suspect is running from them. In this instance, I did not immediately know why Officer DeGrange was engaged in a foot pursuit of an actor on the ground, but I knew from experience that this type of activity has a high potential of danger for both the officer and the public. When a suspect runs from the police[,] the dispatcher labels the call "Officer Assist/Actor on the Ground." An "Officer Assist/Actor on the Ground" call is coded a Priority E. A Priority E response is an emergency response and assumes a potential threat to life or a potential threat of serious bodily injury to a police officer is in progress. It is the highest code response and any officer who hears a Priority E call and is able to respond to the call, should respond. The response time for a Code E is for an officer to arrive as soon as practicable which is the fastest response required by policy. The response time is short because it is important for officers to arrive quickly due to the potential for injury or loss of life.
>
> . . . .
>
> There are various reasons as to why a person would run from the police such as the suspect could have a warrant for their arrest, the

25

suspect may be illegally armed with a weapon, or the suspect had just committed an offense and did not want to be caught by the police. For those reasons, I believed it was immediately necessary to arrive quickly to help Officer DeGrange capture the fleeing suspect who could be armed and could be a danger to Officer DeGrange and the public.

This evidence indicates that the need for response was high, both to protect and assist another officer as well as to protect the public from a potentially dangerous fleeing suspect.

As to risk, Officer Moore considered the same types of factors that Marquez considered. He considered weather, traffic, and visibility, averring that his vehicle was in good working condition, and there was light traffic, clear weather, dry roads, and clear visibility. He averred that he took the most direct and efficient route and drove approximately 65 miles per hour on Emancipation Avenue, where the speed limit is 35 miles per hour. He attested: "I believed it was safe to drive the speed that I did. I have traveled at that speed before and I knew that given the weather and traffic conditions, combined with my experience and training, I could safely travel at that speed." Office Moore stated that he believed the need to reach Officer DeGrange outweighed the risks due to the potential for injury or loss of life to a police officer. He stated that he slowed to approximately 20 miles per hour as he approached the intersection at Elgin Street, where the light was red, and he checked both ways before proceeding through the intersection.

Officer Moore also attested that as he approached the intersection with Cleburne Street, he saw the fire engine in the left lane ahead of him, and the light was green. He saw the fire engine "pull to the left while still in the left lane, pulling further away from [his] lane," and he "believed that the fire truck was yielding for me to pass on the right." Nevertheless, he said: "I covered my brake in case I needed to slow as I approached the intersection." Officer Moore said the light turned from green to yellow "less than one second" before he entered the intersection. He believed he "had enough time to proceed through the intersection before it turned red" because he travels the intersection of Emancipation Avenue and Cleburne Street several times a week as part of his patrol of the area, and he was familiar with the timing of the lights. As he was "about to enter the intersection," Officer Moore saw the fire truck move right toward his lane, and he took evasive measures to minimize damage and reduce potential for injury. Officer Moore "braked and turned [his] steering wheel to the right in the split seconds before the fire truck made contact with my patrol car." He averred that the collision would have occurred if he had braked but not turned toward the right. He opined that "a reasonably prudent law enforcement officer under the same or similar circumstances would have believed that [his] actions were justified based on [his] perception of the facts at the time and that the need to immediately

apprehend the assaultive suspect who was endangering the public outweighed any minimal risk of harm to others from [his] own driving."

Sergeant Dunn's affidavit was essentially the same. He averred that he reviewed Officer Moore's affidavit, Officer Moore's body-worn camera footage, his own evaluation as the responding supervisor on the scene, and the crash report. Sergeant Dunn detailed the same need and risk factors and facts. He agreed with Officer Moore's decision to drive 65 miles per hour. Based on his experience traveling the intersection of Emancipation Avenue and Cleburne Street, Sergeant Dunn expressly concurred with Officer Moore's conclusion that he could cross the intersection with Cleburne Street before the light turned red. He concluded that "a reasonably prudent law enforcement officer under the same or similar circumstances could have believed that Officer Moore's actions were justified based on his perception of the facts at the time, and that the need to immediately arrive to the scene of a potentially dangerous suspect to back up Officer LaGrange outweighed any minimal risk of harm to others from his own driving."

We conclude that this evidence demonstrates that Officer Moore acted in good faith because a reasonably prudent law enforcement officer could have believed that the need to immediately arrive and back up another officer in this situation outweighed the clear risk of harm to the public in operating a patrol

vehicle in an emergency response. *See Clark*, 38 S.W.3d at 582; *Wadewitz*, 951 S.W.2d at 467; *Chambers*, 883 S.W.2d at 656.

In the trial court, Edwards presented no summary-judgment evidence that controverted the affidavits of Officer Moore and Sergeant Dunn. She argues that the *Chambers* test is not satisfied here because in *Chambers*, the Supreme Court balanced the need to "immediately apprehend" a suspect with the "clear risk of harm to the public," but in this case the suspect was apprehended about 30 seconds before the collision. She also questions, without reference to law or the record, whether Officer Moore acted "in good faith after the emergency ended." This is speculation, and it is not sufficient to meet the "elevated standard of proof" that requires a showing that "no reasonable official *could have thought* that the facts were such that they justified the official's conduct." *Chambers*, 883 S.W.2d 656–57 (emphasis added); *see Rodriguez*, 344 S.W.3d at 490–91.

We hold that Edwards failed to carry her summary-judgment burden to create a genuine question of material fact on the element of good faith. *See* TEX. R. CIV. P. 166a(c); *Eagle Oil & Gas Co.*, 619 S.W.3d at 705. We, therefore, further hold that Moore is entitled to official immunity.

## Conclusion

We reverse the order of the trial court, and we render judgment dismissing Edwards's claims against the City.

Peter Kelly
Justice

Panel consists of Chief Justice Adams, and Justices Kelly and Goodman.